IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION



**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 0 7 2023

TAMMY H. DOWNS, CLERK
By:_____ DEP CLERK

| | | |
|---|---|---|
| E.C. and T.C.,<br>Individually<br>and as Parents of J.C.,<br><br>Plaintiffs<br><br>v.<br><br>LITTLE ROCK SCHOOL<br>DISTRICT,<br><br>Defendant | § § § § § § § § § § § § | CASE NO. 4:23-cv-176-JM<br><br>_____<br><br><br>This case assigned to District Judge **Moody**<br>and to Magistrate Judge **Harris** |

---

## COMPLAINT

---

E.C. and T.C., Individually and as Parents and Next Friend of J.C., for

their Complaint state:

### PARTIES

1.    E.C. and T.C. are J.C.'s parents and will be collectively referred

to as "Parents." *See* 20 U.S.C. §1401(23)(C) (definition of "parents").

2.     J.C., age 11, is a child with a disability as defined by the Individual with Disabilities Education Act ("IDEA"), 20 U.S.C. §1401(3)(A)(i).

3.     J.C. is currently in the fifth grade at Don Roberts Elementary School in the Little Rock School District ("LRSD").

4.     LRSD is an Arkansas school district and a public corporation that may be sued in its own name. *See* Ark. Code Ann. §6-13-102(a). Arkansas school districts are not state agencies immune from suit pursuant to the Eleventh Amendment. *See Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003).

5.     Parents seek to recover their attorneys' fees and costs as the prevailing party in proceedings under the IDEA. *See* 20 U.S.C. §1415(i)(3)(B)(i).

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over Parents' IDEA fee claim pursuant to 20 U.S.C. §1415(i)(3)(A).

7.      This Court is the proper venue for Plaintiffs' claim. *See* 28

U.S.C. §1391(b). Plaintiffs reside in Pulaski County, Arkansas. LRSD is

located in Pulaski County. The events giving rise to Plaintiffs'

Complaint occurred in Pulaski County. Pulaski County is in the

Eastern District of Arkansas, Central Division. *See* 28 U.S.C. §83(a)

(1).

### STATEMENT OF FACTS

8.      On February 25, 2022, Parents filed a due process complaint

with the Arkansas Department of Education ("ADE") alleging LRSD

denied J.C. a free appropriate public education ("FAPE") in the

least-restrictive environment ("LRE") in violation of the IDEA.

9.      ADE numbered Parents' due process complaint as H-22-34

and assigned the case to an impartial due process hearing officer

("HO").

10.     A Due Process Hearing was held over the course of seven (7)

days, between July 12, 2022 and August 4, 2022.

11.    On September 9, 2022, the HO issued a Final Decision and

Order finding in favor of Parents and awarding substantial relief

including a comprehensive evaluations and the development of an

appropriate Individualized Education Program ("IEP).

12.    The HO's final decision (redacted) is attached hereto as

**Exhibit A** and incorporated by reference pursuant to Rule 10(c) of

the Federal Rules of Civil Procedure.

13.    The HO found LRSD denied J.C. a FAPE in the LRE from

February 25, 2020 to February 25, 2022 – the entire time period

covered by the due process hearing. **Exhibit A, p. 38**.

### COUNT I:

### IDEA ATTORNEYS' FEES AND COSTS

14.    Parents are the prevailing party in a proceeding under

the IDEA and may be awarded reasonable attorneys' fees and

costs. *See* 20 U.S.C. §1415(i)(3)(B)(i).

15.    The HO's decision awarded Parents actual relief on the

merits of their claim that materially altered the legal

relationship between the parties by modifying LRSD's

4

behavior in a way that directly benefited J.C. *See Birmingham*

*v. Omaha Sch. Dist.*, 298 F.3d 731, 734 (8th Cir. 2002).

16.    LRSD had 90 days to appeal the HO's decision. *See* 20

U.S.C. §1415(i)(2)(B) (90 days to appeal). LRSD's time to

appeal ran on December 8, 2022. LRSD did not file an appeal,

and as a result, the HO's decision is now a final judgment.

17.    The IDEA does not establish a limitations period for an

IDEA fee claim. *See* 20 U.S.C. §1415(i)(3). The Eighth Circuit

has established a 90-day limitations period that starts when

the losing party's time to appeal runs out, or 180 days from

the HO's decision. *See Richardson v. Omaha Sch. Dist.*, 957

F.3d 869, 875-76 (8th Cir. 2020), cert. denied, 141 S. Ct. 2851

(2021); 20 U.S.C. §1415(i)(2)(B) (90 days to appeal). March 8,

2023 is 180 days from the HO's decision. Accordingly,

Parents' IDEA fee claim is timely.

18.    Parents' counsel maintains contemporaneous time records

using an application called *Clockify*. Counsel exercises billing

judgment when entering time into *Clockify* to exclude

unreasonable or unnecessary time. Counsel's time entered into

*Clockify* was reasonable and necessary for Parents to prevail in this

matter.

19.     According to Clockify, Parents' Counsel combined have

reasonably expended 259.35 hours on this case.

20.     Theresa L. Caldwell is lead counsel. Parents seek $350.00 per

hour for her work on this case.

21.     Clay Fendley performed legal research and writing on this

case. Parents seek $250.00 per hour for his work on this case.

22.     Darlene Hogencamp worked as a paralegal on this case.

Parents seek $100.00 per for her work on this case.

23.     Accordingly, Parents seek $88,540.94 in attorneys' fees.

24.     Parents have incurred costs including $306.35 in copying

costs and the $402.00 fee to file this Complaint.

25.     Accordingly, Parents seek $708.35 in costs.

WHEREFORE, Plaintiffs pray that Parents be awarded $88,540.94 for their attorneys' fees and $708.35 in costs as the prevailing party in proceedings under the IDEA; and, that Plaintiffs be awarded all other just and proper relief to which they may be entitled.

Respectfully submitted,

Theresa L. Caldwell
Arkansas Bar Number 91163
Attorney for Plaintiffs

**CALDWELL LAW OFFICE**
14 Alban Lane
Little Rock, Arkansas 72223
Tel.: 501-414-0434
E-mail: theresa@specedattorney.com

**ARKANSAS DEPARTMENT OF EDUCATION**
**Special Education Unit**

IN RE:

**XXXXXXXXXXXX,** Parents on behalf of                          **PETITIONER**
**XXXXXXXX,** Student

      VS.                                    **CASE NO. H-22-34**

**LITTLE ROCK SCHOOL DISTRICT**                                **RESPONDENT**

**HEARING OFFICER'S FINAL DECISION AND ORDER**

**ISSUES PRESENTED:**

Whether the Little Rock School District (hereinafter "District" or "Respondent")
denied XXXXXXXX (hereinafter "Student") a free, appropriate, public education (hereinafter
"FAPE") between February 25, 2020 and February 25, 2022 in violation of certain procedural
and substantive requirements of the Individuals with Disabilities in Education Act of 2004,
20 U.S.C. §§ 1400-1485, as amended (hereinafter referred to as "IDEA"), by: (1) failing to
provide appropriate supports and services to address characteristics of Dyslexia and
academic deficits; and (2) failing to address Student's communication, social and behavioral
deficits resulting from Autism Spectrum Disorder.

**PROCEDURAL HISTORY:**

On February 25, 2022, the Arkansas Department of Education (hereinafter referred
to as "Department") received a request to initiate due process hearing procedures from
XXXXXX and XXXXXX XXXXX (hereinafter referred to as "Parents" or "Petitioners"), the
parents and legal guardian of Student.  Parents requested the hearing because they believed
that District failed to comply with the IDEA, as well as regulations set forth by the
Department, by failing to provide Student with appropriate supports and services to address

**EXHIBIT A**

Dyslexia and academic deficits, as well as failing to address Student's deficits in communication, social and behavioral skills.[1] Parents seek a comprehensive evaluation, compensatory education to address an alleged denial of FAPE, and an appropriate IEP for Student.[2]

In response to Parents' request for hearing, the Department assigned the case to an impartial hearing officer. Thereafter, following continuances granted for good cause in this case, July 12, 2022 was set as the date on which a hearing would commence if the Parents and District failed to reach resolution prior to that time. During the hearing, there were joint requests for continuances made on the record so that both Parents and District would have ample time to complete their presentation of testimony on the issues in this case. All in all, testimony was heard on July 12, 2022, July 13, 2022, July 14, 2022, July 15, 2022, July 18, 2022, August 3, 2022, and August 4, 2022.[3]

The following witnesses testified in this matter: Sophia Williams, Audra Alumbaugh, Jenny Mangham, Kimberly Lawrence, Jeff Whitlow, Aimee Littrell, Dr. Tracy Morrison, Kellee Belt, Kim Swindler, Steven Helmick, and Parents.[4]

Having been given jurisdiction and authority to conduct the hearing pursuant to Public Law 108-446, as amended, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Danna J. Young, J.D., Hearing Officer for the Arkansas Department of Education, conducted a closed impartial hearing. Parents were represented by Theresa Caldwell (Little Rock, Arkansas) and District was represented by Khayyam Eddings (Little Rock, Arkansas).

---

[1] *See* Petitioners' Complaint.
[2] *Id.*
[3] *See generally* Transcript, Vols. I-VII.
[4] *Id.*

Both parties were offered the opportunity to provide post-hearing briefs in lieu of closing statements. Only Petitioners submitted a timely brief for consideration.[5]

## FINDINGS OF FACT:

Student is an eleven-year-old male that attends school in the Little Rock School District.[6]  At the conclusion of the due process hearing in this matter, Student had completed his fifth-grade year at District, specifically at Don Roberts Elementary.[7]  Parents (Mother) testified that she noticed when Student was approximately two years old that he was not exactly like comparably-aged children.[8] Parents (Mother) provided examples to include Student's aversion to loud noises and his tendency to engage in obsessive compulsive behaviors, such as refusing to get into the car until he touched the garage door after it had been closed.[9] Parents had Student comprehensively evaluated when he was in the three/four year class at his daycare, and Student was diagnosed at that time with Sensory Processing Disorder.[10] Ultimately, Parents asked Dr. Ann Prather, a psychological examiner, to comprehensively evaluate Student.

Dr. Prather conducted her evaluation of Student in August 2016, just prior to Student's kindergarten year at Chenal Elementary.[11] She diagnosed Student as having Autism Spectrum Disorder (hereinafter "ASD") and Attention Deficit Hyperactivity Disorder (hereinafter "ADHD"). She further noted that Student was functioning within the low average

---

[5] *See* Petitioners' Post-Hearing Brief.
[6] *See* Petitioners' Complaint.
[7] *Id.*
[8] Transcript, Vol. V, pp. 8-9.
[9] *Id.*
[10] *Id.*
[11] *Id.* at pp. 9-10.

range of intelligence, and that he was academically functioning at a level consistent with his IQ scores.[12]

Student first began receiving speech therapy, occupational therapy, and social skills services through the District's Early Childhood Program when he was attending preschool.[13] During the 2016-2017 school year, Student's kindergarten year and first year at Don Roberts Elementary, Student continued speech therapy for a speech/language impairment, as well as occupational therapy.[14] In the fall of that same year, specifically in September 2016, Student's category of eligibility was changed to Autism, and Student's placement was changed to the self-contained classroom setting for the remainder of the school year.[15] When Student entered first grade, he transitioned out of the self-contained classroom and into the regular classroom, receiving resource services in reading and mathematics.[16] In the second grade, Student continued receiving specialized instruction in reading and mathematics, as well as speech and occupational therapy.[17] Essentially, Student has received special education services pursuant to the IDEA the entire time that he has been enrolled in District.

### *Third Grade Year (2019-2020)*

As Student entered the third grade, his reading level, pursuant to testing conducted at the end of his second grade year, was equivalent to that of a first grader (third month).[18] In the spring semester of 2020,[19] specifically on March 12, 2020, Student began receiving

---

[12] Parent Exhibits, p. 166.
[13] *Id.* at p. 139.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] Transcript, Vol. I, p. 36.
[19] The statutory period covered in this action is February 25, 2020 through February 25, 2022. As such, only the spring of 2020 is addressed here.

services pursuant to an IEP with duration from March 12, 2020 through March 11, 2021.[20] Student's IEP noted that the most recent evaluation of Student was in March 2019. Pursuant to the psychoeducational assessment conducted in March 2019, Student was administered the following assessments: (1) Systematic Observation of Student Performance for a Specific Learning Disability - Literacy; (2) Kaufman Assessment Battery for Children, Second Edition Normative Update (KABC-II NU); (3) Kaufman Test of Educational Achievement, Third Edition (KTEA-3); (4) Comprehensive Test of Phonological Processing, Second Edition (CTOPP-2); (5) Behavior Assessment for Children, Third Edition (Parent and Teacher Rating Scales); and (6) Autism Spectrum Rating Scales (Parent and Teacher Rating Scales).[21]

Regarding the Systematic Observation of Student Performance for Specific Learning Disability, Student was observed during a language arts class.[22] The observer noted that Student was cooperative in getting his white board and sitting on the carpet as instructed, but that Student required teacher assistance after each word was given to students.[23] It was also noted that Student was impulsive, did not review his answers, and did not take time to apply any skills that were being given by the teacher.[24]

Regarding the Kaufman Assessment Battery, Student was administered five scales, specifically the Sequential (Short-Term Memory), Planning (Fluid Reasoning), Simultaneous (Visual Processing), Learning (Long-Term Storage & Retrieval), and Knowledge (Crystallized Ability) scales.[25] Student's scores on all scales fell within the average range, with the

---

[20] Parent's Exhibits, p. 23.
[21] *Id.* at pp. 142-43.
[22] *Id.* at p. 144.
[23] *Id.*
[24] *Id.*
[25] *Id.* at p. 145.

exception of the Sequential (Short-Term Memory) scale, which was below average and placed Student in the 6th percentile.[26]  The composite index of all of these scales was 87, which was also in the average range.[27]

Regarding the Kaufman Test of Educational Achievement, Student's was administered thirteen subtests to determine whether Student had academic deficits.[28] Student was below average in the areas of phonological processing (10th percentile), letter and word recognition (12th percentile), reading comprehension (10th percentile), and written expression (6th percentile).[29] He was in the lower extreme in the category of silent reading fluency.[30] All other areas, including nonsense word decoding, word recognition fluency, object naming facility, letter naming facility, spelling, math computation, and math concepts and application were in the average range.[31]

Regarding the Comprehensive Test of Phonological Processing, Student fell below average on subtests pertaining to blending words (16th percentile), phoneme isolation (16th percentile), nonword repetition (16th percentile), and blending nonwords (16th percentile).[32] His phonological awareness composite score fell below average (14th percentile), as did his phonological memory composite score (21st percentile).[33] Student's scores fell in the very poor and poor categories, respectively, with regard to segmenting nonwords (1st percentile) and alternative phonological awareness (2nd percentile).[34]

---

[26] *Id.*
[27] *Id.*
[28] *Id.* at p. 146.
[29] *Id.*
[30] *Id*.
[31] *Id.*
[32] *Id.* at pp. 148-49.
[33] *Id.*
[34] *Id.*

Student's performance was within the average range in the areas of ellision, memory for digits, rapid digit naming, rapid letter naming, and rapid symbolic naming.[35]

Regarding the Behavior Assessment for Children, which assesses adaptive behavior skills, Parents, as well as Student's teachers, completed rating scales.[36] Parents' ratings placed Student "at risk" in the areas of internalizing problems, behavioral symptoms, anxiety, and withdrawal.[37] Teachers' ratings indicated that Student was "at risk" in the areas of internalizing problems, school problems, attention problems, learning problems, adaptability, social skills, leadership, and study skills.[38] In addition, a review of the teachers' ratings showed "clinically significant" scores in several other areas, including externalizing problems, behavior symptoms, adaptive skills, hyperactivity, aggression, conduct problems, anxiety, depression, atypicality, withdrawal, functional communication, anger control, bullying, developmental social disorders, emotional self control, executive functioning, negative emotionality, resiliency, ADHD probability, Autism probability, and functional impairment.[39] Essentially, every teacher rating score with the exception of one, specifically somatization, was in the "at risk" or "clinically significant" range.[40] Regarding the Autism Spectrum Disorder Rating Scales, Student's teachers and Parents completed rating scales. All rating scores fell within the average range, with the exception of those pertaining to peer socialization which was slightly elevated.[41]

---

[35] *Id.*
[36] *Id.* at pp. 150-51.
[37] *Id.*
[38] *Id.*
[39] *Id*.
[40] *Id.*
[41] *Id.* at pp. 154-55.

After considering the results of these various assessments, District's psychoeducational evaluator concluded that Student was of average intellectual ability, but that he had a "personal and normative weakness" in the area of short-term memory, which is the ability to maintain information and immediately reproduce the information.[42] The evaluator also noted that this was related to attention issues, noting that Student's poor impulse control affected Student's ability to gain knowledge, retain information, and maintain focus in the general education classroom and curriculum. Finally, the evaluator noted that Student exhibited characteristics of dyslexia.[43] The recommendations of the evaluator included, but was not limited to, the following: gearing instruction to Student's level of achievement, expecting completion of assignments or tasks and providing rewards or consequences based on same, providing frequent monitoring of progress, providing activities to improve self concept, setting up communication system between home and school, using a multi-sensory approach with manipulatives to improve learning, using hands-on experiences with concrete materials to enhance learning, matching auditory information with visual cues, reducing amount of instructions given to Student, breaking tasks into small segments, reviewing and reteaching to improve recall and retention of material, allowing extra time to complete assignments, reading materials to Student, providing Student with a quiet place to calm down, using behavior contracts, allowing Student to select rewards, allowing Student to change activities frequently, seating Student away from distractions, wording oral directions clearly, monitoring Student understanding, encouraging Student to ask for direction or information, teaching sight vocabulary, providing

---

[42] *Id.* at p. 157.
[43] *Id.*

written or pictorial models, writing key terms on the board, and repeating important information at a high rate.[44]

Student was also evaluated by an occupational therapist (hereinafter "OT") at District in March 2020. Ultimately, the OT determined that Student did not need OT minutes as a related service; however, she did set goals that Student needed to continue working in the general education classroom.[45] Those goals were as follows: (1) decrease pressure when using writing tools, "as evidenced by no creases on the back of the paper caused by his pencil, 3 consecutive sessions, 100%"; (2) improve ability to organize a task "as evidenced by set up and completion of a game or activity from start to finish, less than 2 verbal cues, 100%, 3 consecutive session; and (3) improve coordination and motor planning "through a variety of tasks or exercises to challenge his ability to perform the task independently upon command, 100%, 3 consecutive sessions.[46]

Student's March 12, 2020 IEP, with duration through March 11, 2021 listed Student's IDEA category of eligibility as Other Health Impairment (hereinafter "OHI") and included a statement of present levels of academic achievement that was consistent with the evaluation results described herein.[47] It was also noted in the present levels section of the IEP that Student had been on a Behavior Intervention Plan (hereinafter "BIP") since December 18, 2019.[48] The IEP stated that Student exhibited characteristics of dyslexia and that his difficulties in the areas of basic reading skills and reading comprehension affected Student's

---

[44] *Id.* at 157-58.
[45] *Id.* at p. 402-03.
[46] *Id.*
[47] *Id.* at pp. 24-25.
[48] *Id.*

learning in all areas.[49] Finally, it was noted that Student had experienced difficulties with social situations and, based on pragmatics testing, would receive speech/language therapy to address these deficits.[50]

In addition, Student's March 12, 2020 IEP included a statement of modifications and accommodations, specifically (1) preferential seating; (2) clearly defined limits, rules, and consequences posted and implemented; (3) redirection of inappropriate behavior; (4) reduction of assignments; (5) short instructions; (6) extra time for completing assignments; and (7) redirection during testing and seat work.[51] The IEP also included three goals, one each in the areas of resource reading, resource math, and speech-language therapy.[52] Student's resource reading goal provided that Student would "be able to apply word analysis skills in order to read fluently and comprehend on his current reading level and answer questions related to main idea/supporting details, summarizing, cause/effect and inference with 80% accuracy by the end of the IEP period."[53] It was noted that progress pertaining to this goal would be based on work samples and grades.[54] Student's resource math goal provided that Student would "represent, compute, and solve math problems involving addition, subtraction, multiplication and division of whole numbers while utilizing grade-appropriate mathematical language and reasoning skills as demonstrated by 80% accuracy."[55] It was noted that progress pertaining to this goal would be based on observation

---

[49] *Id.*
[50] *Id.*
[51] *Id.* at p. 26.
[52] *Id.* at p. 28.
[53] *Id.*
[54] *Id.*
[55] *Id.*

charts and work samples.[56] Student's speech-language therapy goal provided that Student, when presented with age-appropriate books, scripts, role-playing activities, and real-life situations, would "demonstrate improved social communication skills by (a) inferring feelings and ideas of others, (b) exhibiting reciprocity in interactions . . . (c) playing appropriately with peers in structured and unstructured settings . . . , and (d) role-playing cause and effect problem-solving with at least 80% accuracy across three consecutive sessions by March 11, 2021."[57] It was noticed that progress pertaining to this goal would be based on scoring rubrics and "data response."[58] None of the goals included specific objectives.[59]

The December 18, 2019 BIP referenced in Student's IEP was developed in response to a Functional Behavior Assessment (hereinafter "FBA") conducted for Student in October and November 2019.[60] During the fall semester of the 2019-2020 school year, Student engaged in numerous negative behaviors that were documented by the District.[61] The noted behaviors included threatening to kill another student, pushing and elbowing peers, making fun of other students, horseplay, kicking doors, fighting and physical aggression with peers, arguing with teachers, and disrespectful behavior in the classroom.[62] The resulting BIP that was developed for Student addressed strategies for preventing problem behaviors,

---

[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.* at pp. 199-205.
[61] *Id.*
[62] *Id.*

encouraging appropriate behaviors, decreasing inappropriate behaviors, providing effective motivators and rewards, handling misbehavior, and collaborating with Parents.[63]

Student's March 12, 2020 IEP provided for Student to receive 30 minutes per week of speech/language services in social skills, 60 minutes per week of direct instruction in reading, 30 minutes per week of direct instruction in math, 30 minutes per month of occupational therapy, and 30 minutes per week of social skills training.[64] Student's March 12, 2020 IEP was signed by Parents, a general education teacher, a special education teacher, a speech language pathologist, the assistant principal, and the LEA for Chenal Elementary.[65]

Student's IEP did not specifically address a dyslexia intervention program to be provided to Student via special education or in the general education curriculum. However, Student's resource teacher during third grade, Kim Swindler, testified that she used the Take Flight program with Student during the 2019-2020 school year.[66] Ms. Swindler testified that Take Flight should be administered 5 days a week for 45 minutes, or 4 days a week for 60 minutes in order for the program to be taught with fidelity.[67] She testified that, although she saw Student on a daily basis, she did not use Take Flight every day. Instead, she tailored Student's lessons to what he needed at that time.[68] Ms. Swindler also used Take Flight with Student in the first and second grades.[69] Ms. Swindler explained that there were seven books in the Take Flight program, and that Student was nearly finished with the fourth book by the

---

[63] *Id.* at pp. 206-07.
[64] *Id*. at p. 29.
[65] *Id*. at p. 32.
[66] Transcript, Vol. VI, p. 146.
[67] *Id.*
[68] *Id.*
[69] *Id.* at p. 148.

end of his third grade year.[70] She testified that she retired after Student's third grade year, but that she would have predicted that Student could have easily finished the last three books of the program in the fourth and fifth grades based on his progress with her.[71]

Student's NWEA scores in the academic area of reading indicated that he was in the 17th percentile in the fall of 2019, the 12th percentile in the winter of 2020, and the 6th percentile in the spring of 2020.[72] All measured skills were in the low or low average range across all test administrations.[73] Student's NWEA scores in the academic area of math indicated that he was in the 17th percentile in the fall of 2019, the 6th percentile in the winter of 2020, and the 7th percentile in the spring of 2020.[74] Student scored low on all composite areas for math at each test administration.[75] Student's NWEA scores in the academic area of science indicated that he was in the 36th percentile in the fall of 2019, the 3rd percentile in the winter of 2020, and the 12th percentile in the spring of 2020.[76]

### *Fourth Grade Year (2020-2021)*

Student's IEP and special education programming for the fall 2020 was the same as that described for the spring semester of 2020 (Student's third grade year) on account of the fact that Student's IEP was not on a standard school year calendar but, alternatively, had a duration from March 12, 2020 to March 11, 2021.

---

[70] *Id.* at p. 149.
[71] *Id.*
[72] Parent's Exhibits, p. 240.
[73] *Id.*
[74] *Id.*
[75] *Id.*
[76] *Id.*

Prior to Student's annual review conference on January 29, 2021, there was an incident on January 20, 2021 in which Student eloped from school.[77] On the day in question, Student attended school and reportedly had a good morning in class. His class watched the U.S. Presidential Inauguration (kids program) that morning and completed many related projects and activities.[78] At the conclusion of these events, Student, along with the remainder of his class, was taken to the playground by another staff member for a short recess.[79] No recess issues were reported.[80] When students returned to the classroom after recess, activities resumed and, unfortunately, Student's teacher did not realize that Student was missing.[81] Eventually, the principal, Steven Helmick, contacted Student's teacher and inquired about what happened.[82] It was then reported that Student had left school, wandered to the house of a stranger, and requested a ride home.[83] Neither the school nor Student's parents knew that Student had left school until Student arrived home with the stranger who had given him a ride.[84] Mr. Helmick recalled having discussions with Parents following this meeting, but could not remember specific details of the meetings.[85]

On January 29, 2021, a new IEP was implemented as a result of Student's annual programming conference. The duration of this IEP was from January 29, 2021 through January 24, 2022.[86] Student's IEP included a statement of present levels of academic achievement, noting Student's academic abilities in math and reading. Regarding Student's

---

[77] *Id.* at pp. 210-11.
[78] *Id.*
[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] Transcript, Vol. VI, pp. 187-88.
[86] Parent's Exhibits, p. 11.

math abilities, it was noted that Student was able to add and subtract three digit numbers with regrouping, answer multi-step word problems with subtraction and addition, identify equivalent fractions, write a fraction from a shaded diagram, and identify numbers within 1000 using base ten blocks..[87] It was also noted that Student was able to multiply two digit by one digit multiplication problems. Student, however, was struggling as of date of this IEP with understanding concepts of division and fourth grade math concepts.[88] Regarding the academic area of reading, Student was described as being able to apply grade-level phonics and word analysis skills in decoding. Student's DRA level was stated as level 40, which was noted to be the reading level equivalent to that expected of students in the middle of the fourth grade year.[89] Student was able to make three predictions and create three questions after reading the beginning paragraphs of a story. In addition, after reading text independently, he was able to list three facts about the main character, predict the character's emotion during the story, and make inferences beyond the text.[90] Finally, it was explained that Student had difficulty answering questions in complete sentences and summarizing ideas and thoughts when writing. Student was more likely to use correct sentence structure, capitalization, punctuation, and grammar when able to use reminder checklists.[91]

In addition to addressing Student's specific academic abilities and difficulties, the present levels section of his January 29, 2021 IEP reiterated that Student continued to have short-term memory issues and poor impulse control, both of which impact Student's ability

---

[87] *Id.* at pp. 12-13.
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*

to gain and retain information. It was also noted that Student was continuing to show characteristics of dyslexia, with notation that Student's deficits in the areas of basic reading skills, reading comprehension, and fluency had an effect on Student's ability to learn all subjects.[92]

Student's January 29, 2021 IEP also included a statement of modifications and accommodations, specifically (1) preferential seating; (2) clearly defined limits, rules, and consequences posted and implemented; (3) redirection of inappropriate behavior; (4) short breaks; (5) opportunity to respond orally; (6) reduction of assignments; (7) short instructions; (8) extra time for completing assignments; (9) redirection during testing and seat work; (10) positive praise check ins; and (11) multiplication chart with multi-step problems.[93] The IEP also included three goals, one each in the areas of reading/writing, math, and speech-language therapy.[94] Student's reading/writing goal provided that Student, when presented with an instructional level nonfiction reading passage, would "summarize the information, using writing rubrics and scaffolding as needed to write a paragraph with a topic sentence, three supportive sentences and a conclusion with correct punctuation and capitalization with 80% accuracy by the end of the IEP cycle."[95] It was noted that progress pertaining to this goal would be based on work samples and grades.[96] Student's math goal provided that Student would "represent, compute, and solve math problems involving multiplication and division of whole numbers while utilizing grade-appropriate

---

[92] *Id.*
[93] *Id.* at p. 14.
[94] *Id.* at p. 16.
[95] *Id.*
[96] *Id.*

mathematical language and reasoning skills as demonstrated by 80% accuracy."[97] It was noted that progress pertaining to this goal would be based on observation charts and work samples.[98] Student's speech-language therapy goal provided that Student, when presented with age-appropriate books, scripts, role-playing activities, and real-life situations, would "demonstrate improved social communication skills by (a) inferring feelings and ideas of others, (b) exhibiting reciprocity in interactions . . . (c) playing appropriately with peers in structured and unstructured settings . . . , and (d) role-playing cause and effect problem-solving with at least 80% accuracy across three consecutive sessions by March 11, 2021."[99] It was noted that progress pertaining to this goal would be based on scoring rubrics and "data response."[100] None of the goals included specific objectives.[101] Student's December 18, 2019 BIP remained in place during the duration of this IEP as well, and the team discussed the incident that had occurred on January 20, 2021 in which Student eloped from school.

Student's January 29, 2021 IEP provided for Student to receive 60 minutes per week of speech/language services in social skills, 60 minutes per week of direct instruction in reading, 60 minutes per week of direct instruction in math, and 60 minutes per week of social skills training.[102] Student was not scheduled to receive occupational therapy. The IEP did not specifically address a dyslexia intervention program to be provided to Student via special education or in the general education curriculum.  Student's resource teacher confirmed that she did not provide a dyslexia intervention program in her work with

---

[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*
[102] *Id.* at p. 17.

Student.[103] Student's January 29, 2021 IEP was signed by parents, a general education teacher, a special education teacher,  a speech language pathologist, the assistant principal, and the LEA for Chenal Elementary.[104]

Student's NWEA scores in the academic area of reading indicated that he was in the 27th percentile in the fall of 2020, the 22th percentile in the winter of 2021, and the 21st percentile in the spring of 2021.[105] Student's Lexile score was 245L-395L, which is the equivalent of approximately a first-grade reading level.[106] All measured skills were in the low or low average range across all test administrations.[107] Student's NWEA scores in the academic area of math indicated that he was in the 8th percentile in the fall of 2020, the 5th percentile in the winter of 2021, and the 8th percentile in the spring of 2021.[108] Student scored low on all composite areas for math at each test administration.[109] Student's NWEA scores in the academic area of science indicated that he was in the 29th percentile in the fall of 2020, the 5th percentile in the winter of 2021, and the 12th percentile in the spring of 2021.[110]

Student was administered the ACT Aspire in the spring of 2021. This test evaluated Student's performance in the academic areas of English, reading, math, and science.[111] Student's scores in English and math were "close" to the stated benchmark, and his scores in reading and science were "in need of support."[112] Student's English score was in the 17th

---

[103] Transcript, Vol. II, p. 104.
[104] Parent's Exhibits, p. 20.
[105] *Id.* at p. 240.
[106] *Id. See also* Parents' Exhibits, p. 356.
[107] Parent's Exhibits, p. 240.
[108] *Id.*
[109] *Id.*
[110] *Id.*
[111] *Id.* at p. 238.
[112] *Id.*

percentile, his reading score was in the 28th percentile, his science score was in the 9th percentile, and his math score was in the 44th percentile.[113]

### *Fifth Grade Year (2021-2022)*

Student's IEP and special education programming for the fall 2021 was the same as that described for the spring semester of 2021 (Student's fourth grade year) on account of the fact that Student's IEP was not on a standard school year calendar but, alternatively, had a duration from January 29, 2021 to January 24, 2022.

On October 21, 2021, Student threatened to commit suicide while at school, prompting District to contact a mobile assessment unit to evaluate Student. Following Student's evaluation at school for suicidal threats, Student began seeing a counselor, specifically Molly Bloom, at Napa Valley Counseling Center.

On October 28, 2021, Parents sent an email to the principal, alleging that the parents of other students had reached out to inform them that Student was being bullied.[114] Parent's email alleged that Student was being told by other classmates that he "belonged in hell" and to "go fuck himself," and that this had made Student contemplate suicide.[115] Parents addressed these allegations with Student, and Student told Parents that two different kids had targeted him. The following day, on October 29, 2021, the principal responded to Parent's concerns via email, and let them know that he was working on the situation and trying to gain an understanding of what was going on.[116]

---

[113] *Id.*
[114] *Id.* at pp. 286.
[115] *Id.*
[116] *Id.*

When questioned about whether Student was bullied, Student's fourth and fifth grade resource teacher testified that Student often replayed events from the past, but that what he was reporting did not comport with what was happening in the classroom.[117] For example, Student constantly talked about being in the self-contained classroom and kids making fun of him, even though he had not been in that classroom for three years.[118] Student continually alleged that a peer told him to die in a ditch, which happened a couple of years prior, but was not happening in fifth grade at the time that Student was continually making these allegations.[119] Finally, Student often talked about a teacher that he thought was mean to him, but the teacher in question had not worked with Student since the third grade.[120] Student's resource teacher explained that she believed that these experiences were part of Student's "story," but that the things he was alleging were not actively happening in the classroom.[121] Student's fifth grade general education teacher also reported that Student obsessed about past events.[122] He stated that Student had experienced some name calling by two different students on the playground toward the beginning of fifth grade, but that the situation had been addressed and Student's reference to this throughout the year was not founded.[123]

In a counseling note dated November 3, 2021, Ms. Bloom assessed Student's thought processes as "perseveration," and also noted that Student's thought content contained "obsessions."[124] Finally, Ms. Bloom assessed Student's mental status as it related to

---

[117] Transcript, Vol. II, pp. 173-74.
[118] *Id.*
[119] *Id.*
[120] *Id.*
[121] *Id.*
[122] Transcript, Vol. III, pp. 46-50.
[123] *Id.* at p. 157.
[124] Parent's Exhibits, p. 217.

perception to be affected by "auditory hallucinations."[125] Throughout the time that Ms. Bloom treated Student, Student's feelings of suicidal ideation decreased, however, Ms. Bloom continually noted that Student had intrusive thoughts pertaining to bullying. In one specific therapy note, Ms. Bloom stated that the issue of bullying was very real to Student,  even if bullying was not occurring in reality.[126]

On January 25, 2022, Student's IEP team intended to meet for Student's annual review and development of a new IEP; however, Parents requested that the IEP meeting be rescheduled.[127] Student's IEP team met on February 8, 2022 to develop a new IEP, and that IEP was ultimately amended shortly thereafter on February 17, 2022. [128] As such, the duration of Student's most recent IEP prior to the filing of this due process complaint had a duration from February 17, 2022 through January 27, 2023.[129] The reason noted for the February 17, 2022 amendment to Student's IEP was Student safety.[130] Student's category of disability for purposes of this IEP was listed as Other Health Impairment on account of his ADHD Diagnosis.[131] Student's resource teacher testified that she continued providing the services from Student's prior IEP, the one that ended on January 24, 2022, until a new IEP was developed for Student.[132]

Also on February 17, 2022, District provided to Parents a Notice of Action, outlining the IEP meeting that occurred on this same date and referencing the implementation of a

---

[125] *Id.*
[126] *Id.* at pp. 217-227.
[127] Transcript, Vol. II, p. 194.
[128] Parent's Exhibits, pp. 1, 63.
[129] *Id.* at p. 1.
[130] *Id.*
[131] *Id.* at p. 2.
[132] Transcript, Vol. II, p. 194.

safety plan for Student.[133] The event that precipitated this meeting was Student's elopement from school on February 16, 2022.[134] On this date, Student was in his general education class learning math. Student reportedly had a typical day with his teacher and peers, and had not needed redirection during math in order to complete his work.[135] Throughout the class period, Student continually asked if he could leave the classroom and go visit with Mr. Helmick; however, this was not unusual for Student.[136] Student's teacher reported that after Student completed his work, Student was permitted to go to the office and see Mr. Helmick.[137] Student did not go to the principal's office, however, and instead left campus.[138] Student's teacher contacted the office after Student had not returned in a normal time period, and a search was immediately commenced.[139] In addition, District security and Student's parents were contacted, while the building administrator for the school began driving around the area searching for Student.[140] Approximately 20 minutes later, Student was located by the building administrator and Student willingly got in the car and returned to school.[141]

Following the IEP meeting on February 17, 2022, which addressed Student's February 16, 2022 elopement, Student eloped a second time from school. Specifically, on February 22, 2022, Student was again in math class. He continually asked to leave the classroom during the lesson; however, Student's teacher declined to let him leave the

---

[133] Parent's Exhibits, p. 78.
[134] Id.
[135] Id.
[136] Id.
[137] Id.
[138] Id.
[139] Id.
[140] Id.
[141] Id.

room.[142] Student ran out of the classroom anyhow, and his peers began yelling at the teacher that Student had left the classroom.[143] Student's teacher and Mr. Helmick both chased Student until it was apparent that Student had left school property, after which 911 was dispatched and Parents were called.[144] Student was ultimately found in a ravine in a nearby neighborhood after approximately one and one half hours.[145]

Following Student's safe return to school on February 17, 2022, Parents, administrative personnel, and Student were able to meet.[146] In addition, Parents invited Student's counselor, Ms. Bloom to join the meeting. Ms. Bloom advised that, based on her conversations with Student, it appeared that the event unfolded very quickly for him when he began to experience stress.[147] Student's IEP team sought consent to conduct an FBA for Student and offered school based mental health services.[148] Parents consented to the FBA, but chose for Student to continue counseling services with Ms. Bloom as opposed to utilizing school based mental health services.[149] At this same meeting on February 17, 2022, modifications were made to Student's January 25, 2022 IEP for the purpose of addressing Student's safety at school.[150] Following Student's second elopement on February 22, 2022, a safety plan, with start date of February 25, 2022, was created for Student. The plan outlined protocols for notifying the office and staff roles in case of Student's elopement.[151] Specifically, the document provides that, in case of elopement, Student's aid will follow him

---

[142] Transcript, Vol. VI, pp. 193-97.
[143] *Id.*
[144] *Id.*
[145] *Id.*
[146] Parent's Exhibits, p. 78.
[147] *Id.*
[148] *Id.*
[149] *Id.*
[150] *Id.*
[151] *Id.* at p. 80

and immediately alert a support team of the elopement.[152] In response, assigned staff will go to surrounding exit doors, while continuously communicating with Student's aid via walkie talkies.[153] Finally, the team will communicate when the student is secure and will follow up by immediately informing Parents.[154]

Student's February 17, 2022 IEP included a statement of present levels of academic achievement, noting that Student typically arrived at school on time and was prepared and ready to engage in the classroom.[155] Student's teacher also noted that Student enjoyed being engaged in large and small group settings and was not hesitant to ask questions, but noted that he often attempted to control his environment by "asking repeatedly to leave the classroom to visit the principal" or to take breaks.[156]

Regarding social skills, Student's IEP team noted that he struggled with his peers and being able to appropriately process worries of not fitting in.[157] Specifically, the present levels section of the IEP states as follows: "He will lash out when he has these feelings by making inappropriate comments or accusations. Often it consumes his day and he needs support of administration or the school counselor until he is able to reason. [Student] needs strict structure and understanding of any routine changes that may occur."[158] Regarding reading, Student's IEP noted that Student had a strong vocabulary as compared to his peers and was able to make inferences from a text.[159] It was also noted that Student excelled in both

---

152 *Id.*
153 *Id.*
154 *Id.*
155 *Id.*
156 *Id.*
157 *Id.*
158 *Id.*
159 *Id.*

comprehension from reading, as well as auditory comprehension. Regarding writing, it was noted that Student needed prompts to stay on task and benefited from writing rubrics and graphic organizers.[160] Finally, regarding the academic area of math, Student's IEP team noted that Student struggled with attention in breaking down word problems into manageable chunks and identifying place values with decimals; however, he was "successful with grade level standards and minimal support in the area of math."[161]

Student's February 17, 2022 IEP also included a statement of modifications and accommodations, specifically (1) preferential seating; (2) clearly defined limits, rules, and consequences posted and implemented; (3) redirection of inappropriate behavior; (4) redirection during testing and seat work; (5) positive praise checkins; (6) reduced writing assignments; (7) small group or 1:1 intervention; (8) peer tutoring; (9) adult accompaniment for transitions outside of the classroom; (10) notification to admin/office if student ran away from adult; (11) check in and check out by an adult during recess; (12) plans for substitute teachers regarding transitions; (13) Student located away from classroom doors; (14) Student seated close to teacher; (15) positive reinforcement for work completion; and (16) Student instruction of replacement behaviors.[162] The IEP, as in prior school years, included three goals, one each in the areas of reading/writing, math, and speech-language therapy.[163] Student's reading/writing goal provided that Student, when presented with an opinion based writing prompt, would produce a written work that included three paragraphs, an introduction/claim, three pieces of evidence to support the

---

[160] *Id.*
[161] *Id.*
[162] *Id.* at p. 4.
[163] *Id.* at p. 6.

claim, and an opposing view statement, and conclusion (with correct punctuation and capitalization) with 80% accuracy by the end of the IEP cycle.[164] It was noted that progress pertaining to this goal would be based on work samples and grades.[165] Student's math goal provided that Student would "represent, compute, and solve math problems involving multiplication and division of fractions while utilizing grade-appropriate mathematical language and reasoning skills as demonstrated by 80% accuracy."[166] It was noted that progress pertaining to this goal would be based on observation charts and work samples.[167] Student's speech-language therapy goal provided that Student, when presented with age-appropriate books, scripts, role-playing activities, and real-life situations, would "demonstrate improved social communication skills by (a) inferring feelings and ideas of others, (b) exhibiting reciprocity in interactions . . . (c) playing appropriately with peers in structured and unstructured settings . . . , and (d) role-playing cause and effect problem-solving with at least 80% accuracy across three consecutive sessions by 2/7/2023."[168] It was noted that progress pertaining to this goal would be based on scoring rubrics and "data response."[169] None of the goals included specific objectives.[170]

Student's February 17, 2022 IEP provided for Student to receive 240 minutes per quarter (four hours) of speech/language services in social skills, 30 minutes per week of direct instruction in reading, 30 minutes per week of direct instruction in math, and 240

---

[164] *Id.*
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] *Id.*
[169] *Id.*
[170] *Id.*

minutes per quarter (four hours) of social skills training.[171] Student was not scheduled to receive occupational therapy. The IEP did not specifically address a dyslexia intervention program to be provided to Student via special education or in the general education curriculum. Student's February 17, 2022 IEP was signed by Parents (father), a general education teacher, a special education teacher, a speech language pathologist, the assistant principal, the LEAs for Chenal Elementary, and the school counselor.[172]

Student's general education teacher reported that Student was reading on approximately a third-grade level when he began fifth grade (2021-2022 school year).[173] District's dyslexia specialist testified that based on Student's scores on two screeners, specifically, the Hegrity and the WIST, it was her opinion that Student no longer had characteristics of dyslexia that needed to be addressed during the fifth grade.[174] Student's NWEA scores in the academic area of reading indicated that he was in the 26th percentile in the fall of 2021, the 20th percentile in the winter of 2022, and the 4th percentile in the spring of 2022.[175] Student's Lexile score was 245L-395L, which is the equivalent of approximately a first-grade reading level, and the same as the prior year.[176] All measured skills were in the low range across all test administrations.[177] Student's NWEA scores in the academic area of math indicated that he was in the 14th percentile in the fall of 2021, the 20th percentile in the winter of 2022, and the 18th percentile in the spring of 2022.[178] Student scored low on

---

[171] *Id.* at p. 7.
[172] *Id.* at p. 10.
[173] *Id.* at p. 154.
[174] Transcript, Vol. VI, pp. 135-36.
[175] Parent's Exhibits, p. 229.
[176] *Id.* See also Parents' Exhibits, p. 356.
[177] Parent's Exhibits, p. 229.
[178] *Id.*

all composite areas for math at each test administration, with the exception of one that was average (operations and algebraic thinking).[179] Student's NWEA scores in the academic area of science indicated that he was in the 36th percentile in the fall of 2021, the 23rd percentile in the winter of 2022, and the 15th percentile in the spring of 2022.[180] During the first and second quarters of the 2021-2022 school year, Student earned As and Bs in all classes pursuant to his grade report.[181] In the third quarter of the school year, Student earned all As and Bs, with the exception of one class, specifically language arts, in which he earned a C.[182]

## CONCLUSIONS OF LAW AND DISCUSSION:

Pursuant to Part B of the IDEA, states are required to provide a FAPE for all children with disabilities between the ages of three and twenty-one. 20 U.S.C. § 1412(a); 34 C.F.R. § 300.300(a). In 1982, in *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, the U.S. Supreme Court addressed the meaning of FAPE and set forth a two-part analysis that must be made by courts and hearing officers in determining whether a school district has failed to provide FAPE as required by federal law. 458 U.S. 176, 206-07 (1982).  Pursuant to *Rowley*, the first inquiry that a court or hearing officer must make is that of whether the State, *i.e.* local educational agency or district, has complied with the procedures set forth in the IDEA.  Thereafter, it must be determined whether the IEP(s) developed pursuant to IDEA procedures was reasonably calculated to enable the student to make appropriate progress in light of his specific circumstances. *Id.*

---

[179] *Id.*
[180] *Id.*
[181] *Id.* at p. 251.
[182] *Id.*

Regarding the first inquiry, that of whether District complied with the procedures set forth in the IDEA, Petitioners did not raise any specific procedural violations in their due process complaint. As such, it is the conclusion of this Hearing Officer that District did not procedurally violate the IDEA.

Having considered the first prong of the FAPE analysis, it is now necessary to analyze whether the District substantively denied FAPE to Student, *i.e.* whether the District failed to provide IEPs that were reasonably calculated to enable Student to make appropriate progress in light of his individual circumstances. Prior to March 22, 2017, Eighth Circuit law provided that if a student received "slight" or "de minimis" progress, then he or she was not denied educational benefit. *K.E.*, 647 F.3d at 810; *Paris Sch. Dist. v. A.H.*, 2017 WL 1234151 (W.D. Ark 2017). On March 22, 2017, however, the United States Supreme Court "rejected the 'merely more than *de minimis*' standard that had previously been the law of the Eighth Circuit." *Paris Sch. Dist.*, 2017 WL at 4 (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, No. 15-827*, 2017 WL 1066260, 580 U.S. ___ (2017), 137 S.Ct. 988 (2017)).

In *Endrew F.*, the standard set forth by the Court is "markedly more demanding" as compared to the "merely *de minimis*" test outlined in *Rowley*. *Endrew F.*, 137 S. Ct. at 1000. The Court stated the following:

> It cannot be the case that the Act typically aims for grade-level advancement for children with disabilities who can be educated in the regular classroom, but is satisfied with barely more than *de minimis* progress for those who cannot. When all is said and done, a student offered an educational program providing "merely more than *de minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time when they were old enough to "drop out."

*Endrew F.*, 137 S.Ct. at 1001 (citations omitted). The Court held that the IDEA requires, even demands, more. Specifically, the IDEA requires that students under the Act be provided with

an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

The IEP is the guiding document and primary method for providing special education services to disabled children under the IDEA. *Honig v. Doe*, 484 U.S. 305, 311 (1988). "Through the development and implementation of an IEP, the school provides a FAPE that is 'tailored to the unique needs of a particular child.'" *Paris Sch. Dist.*, 2017 WL 1234151, at *5 (citing *Endrew F.*, 2017 WL 1066260, at *1000). An IEP is not designed to be merely a form but, instead, a substantive document that is developed only after a district has carefully considered a student's "present levels of achievement, disability, and potential for growth." *Id.* (citations omitted). Pursuant to *Endrew F.*, a district "must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 2017 WL 1066260, at *1000. For most students, to comply with this standard, providing FAPE "will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." *Id.* However, in the event that this is not possible, the education of a disabled child still needs to be "appropriately ambitious" in light of a student's individual circumstances. *Id.*

Every IEP, pursuant to the IDEA, is required to include the following: (1) a statement of a student's present levels of academic achievement and functional performance; (2) a description of how a student's disability affects his or her involvement and progress in the general education curriculum; (3) annual goals that are measurable, as well as a description as to how progress toward stated goals will be measured; and (4) a description of special education and related services provided to student. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV).

In the present case, Parent alleged that District did not provide FAPE to Student between February 25, 2020 and February 25, 2022, by failing to provide appropriate supports and services to address characteristics of Dyslexia and academic deficits and, also, by failing to address Student's communication, social and behavioral deficits resulting from Autism Spectrum Disorder.

### **FAPE: Dyslexia and Academic Deficits**

Parents allege that Student's IEPs for the 2019-2020 (beginning February 25, 2020), 2020-2021, and 2021-2022 (through February 25, 2022) school years were inappropriate because they failed to provide specialized instruction regarding dyslexia intervention services, as well as special education instruction to address Student's other academic deficits in math and science. This Hearing Officer agrees.

***March 12, 2020 IEP.*** Based on the evidence in the record, it is the opinion of this Hearing Officer that Student's March 12, 2020 IEP failed to provide FAPE to Student. Here, Student's IEP included an appropriate statement of his present levels of academic achievement and functional performance, appropriate accommodations, and an adequate description of how Student's disability affected his involvement and progress in the general education curriculum. His March 12, 2020 IEP, however, failed to provide appropriate annual goals and special education services to address Student's deficits.

Regarding the academic area of reading, Student's most recent reading level at the time that the March 12, 2020 IEP was developed was that of first grade, third month. Based on the data available, Student was nearly two grade levels behind in reading. In addition, test results from March 2019 indicated that Student required teacher assistance in language arts class, as he was impulsive and did not take time to apply any skills that were taught by the

teacher. The Kaufman Test of Educational Achievement, administered in March 2019, indicated that although Student was average in nonsense word decoding, word recognition fluency, object naming facility, letter naming facility, and spelling, Student was below average in numerous areas, including phonological processing, letter and word recognition, reading comprehension, and written expression, with scores falling between the 6th and 12th percentiles in these areas. The results of the March 2019 CTOPP confirmed Student's deficits, with Student's scores falling below average on subtests pertaining to blending words, phoneme isolation, nonword repetition, and blending nonwords. Student's phonological awareness composite score and his phonological memory composite score were both below average as well. Student's scores regarding segmenting nonwords and alternative phonological awareness were particularly low, falling at the 1st and 2nd percentile, respectively.

In light of this evidence, it is clear that Student's March 12, 2020 IEP was insufficient with regard to goals and services so as to enable Student to make progress in light of his circumstances. Regarding goals and objectives, Student had only one reading goal, which provided that Student would "be able to apply word analysis skills in order to read fluently and comprehend on his current reading level and answer questions related to main idea/supporting details, summarizing, cause/effect and inference with 80% accuracy by the end of the IEP period. This goal had no specific objectives, and, although Student's third and fourth grade resource teachers testified that they measured progress, there are no specific documents that show how this goal was measured and whether Student was successful. Regarding special education services in the area of reading, Student's IEP provided for only 60 minutes per week of direct instruction in reading. Student's resource teacher testified

that, because Student had characteristics of dyslexia, she was using the Take Flight dyslexia program with Student during the spring of 2020. It is important to note, however, that the number of special education minutes provided to Student each week did not provide enough time for Student to be administered the Take Flight program with fidelity, which requires between 225 and 240 minutes per week. Finally, Student's test scores support the conclusion that Student's March 12, 2020 IEP was not reasonably calculated to enable a child to make appropriate progress in light of his circumstances. At the time of IEP development, Student's most recent NWEA scores (winter 2020) indicated that Student was reading at the 12th percentile, which was 5 percentage points below where Student scored at the beginning of third grade.

Regarding the academic areas of math, Student's test scores during his March 2019 evaluation were in the average range; however, his most recent NWEA score as of the time of IEP development was in the 6th percentile (winter 2020), which represented a drop of 11 percentage points as compared to his scores at the beginning of third grade. Despite this, Student had only one math goal, which provided that Student would "represent, compute, and solve math problems involving addition, subtraction, multiplication and division of whole numbers while utilizing grade-appropriate mathematical language and reasoning skills as demonstrated by 80% accuracy." As with Student's reading goal, this goal had no objectives. Again, there was testimony that progress data was recorded, however, there were no specific documents to establish this assertion. Finally, Student's special education minutes provided only 30 minutes per week for math. This amount of time is simply insufficient to address Student's deficits in math given the fact that he was scoring at the 6th percentile on the NWEA at the time that this IEP was developed.

Here, Student's IQ was average. Yet, his reading and math scores were woefully low. In fact, throughout the duration of Student's March 12, 2020 IEP, his reading and math scores continued to fall, with spring 2020 NWEA scores showing Student in the 6th percentile in reading and the 7th percentile in math. In light of Student's circumstances, i.e. average intelligence, Student's March 12, 2020 IEP was not reasonably calculated to enable him to make appropriate progress in light of his circumstances in the academic areas of reading and math. As such, it is the opinion of this Hearing Officer that Student's March 12, 2020 IEP denied Student FAPE and, therefore, resulted in a substantive violation of the IDEA.

***January 29, 2021 IEP.*** Based on the evidence in the record, it is the opinion of this Hearing Officer that Student's January 29, 2021 IEP failed to provide FAPE to Student. As with Student's third grade IEP, the January 29, 2021 IEP included an appropriate statement of Student's present levels of academic achievement and functional performance, appropriate accommodations, and an adequate description of how Student's disability affected his involvement and progress in the general education curriculum. Student's January 29, 2021 IEP, however, failed to provide appropriate annual goals and special education services to address Student's deficits.

Regarding the academic area of reading, Student's most recent reading level at the time that the January 29, 2021 IEP was developed was his NWEA score and associated Lexile score, which indicated that Student was still reading on a first grade level at the end of third grade. Essentially, Student's reading level had not progressed during the entirety of third grade, and Student was nearly three grade levels behind in reading as he approached the fourth grade. It was also noted that Student was continuing to show characteristics of dyslexia, with notation that Student's deficits in the areas of basic reading skills, reading

comprehension, and fluency had an effect on Student's ability to learn all subjects. Still yet, Student had only one reading goal which was essentially a writing goal. Specifically, the goal provided that Student, upon reading a nonfiction passage, would summarize information and use writing rubrics to write a paragraph with topic sentences, support sentences, and a conclusion with 80% accuracy. As did the prior IEP, Student's January 29, 2021 IEP did not provide any objectives for the goals that were stated, and there was no clear evidence of progress monitoring. Finally, Student's special education minutes in the academic area of reading did not increase. Despite the fact that Student regressed during the previous academic year, District did nothing different regarding reading as it developed Student's January 29, 2021 IEP. In fact, considering that no dyslexia program was provided to Student during the fourth and fifth grades, District technically provided less programming for Student in the academic area of reading.

Regarding the academic area of math, Student's most recent NWEA score as of the time of IEP development was in the 8th percentile (fall 2020). Despite this, Student had only one math goal,  which provided that Student would "represent, compute, and solve math problems involving multiplication and division of whole numbers while utilizing grade-appropriate mathematical language and reasoning skills as demonstrated by 80% accuracy." With the exception of the removal of addition and subtraction from this goal, it is identical to the goal written for the March 12, 2020 IEP.  In addition, as before, the goal has no specific objectives or clear progress monitoring. Student's IEP team did increase his special education minutes in math from 30 minutes to 60 minutes per week; however, there is no clear programming addressed for Student as it relates to math and, given Student's deficit in

this area on testing, only 60 minutes per week of special education services in this academic area is insufficient.

As with the prior IEP, the fact that Student's IQ was average cannot be ignored. In light of this, Student's January 29, 2021 IEP was not reasonably calculated to enable Student to make appropriate progress in reading and math. As such, it is the opinion of this Hearing Officer that Student's January 29, 2021 IEP denied Student FAPE and, therefore, resulted in a substantive violation of the IDEA.

***February 17, 2022 IEP.***  Based on the evidence in the record, it is the opinion of this Hearing Officer that Student's February 17, 2022 IEP failed to provide FAPE to Student in the academic areas of reading and math.  As with Student's third and fourth grade IEPs, the February 17, 2022 IEP included an appropriate statement of Student's present levels of academic achievement and functional performance, appropriate accommodations, and an adequate description of how Student's disability affected his involvement and progress in the general education curriculum. Again, however, Student's February 17, 2021 IEP failed to provide appropriate annual goals and special education services to address Student's deficits.

Regarding the academic area of reading, Student's most recent reading level at the time that the February 17, 2022 IEP was developed was his NWEA score from the winter 2022, which indicated that Student was at the 20th percentile in reading. In addition, Student's fifth grade general education teacher estimated his reading level to be approximately at the third grade at the beginning of the 2021-2022 school year. Despite some gains, based on this evidence, Student remained two grade levels behind his peers in reading.  Still yet, Student had only one reading goal which provided that Student, when

presented with an opinion based writing prompt, would produce a written work that included three paragraphs, an introduction/claim, three pieces of evidence to support the claim, and an opposing view statement, and conclusion (with correct punctuation and capitalization) with 80% accuracy by the end of the IEP cycle. As with prior IEPs, this goal had no objectives and there was little to no evidence of progress monitoring. In addition, Student's special education minutes in the area of reading were decreased by half, specifically to 30 minutes per week. He also was not provided with any dyslexia services. Again, based on the reduction in minutes, District essentially provided less services to Student than it had the prior year.

Regarding the academic area of math, Student's most recent NWEA score as of the time of IEP development was in the 20th percentile (winter 2020). Despite this, Student had only one math goal, which provided that Student would "represent, compute, and solve math problems involving multiplication and division of fractions while utilizing grade-appropriate mathematical language and reasoning skills as demonstrated by 80% accuracy." In addition, Student's special education minutes in the area of math were reduced by half, to 30 minutes weekly. Again, although some gains appear to have been made in math, Student was certainly not at a point of progress that justified decreasing his special education minutes.

In sum, Student's March 12, 2020, January 29, 2021, and February 17, 2022 IEPs were not reasonably calculated to enable Student to make appropriate progress in reading and math. Essentially, Student's goals remained the same or similar from year to year, with no objectives, insufficient progress monitoring, and no appropriate dyslexia intervention. In addition, despite little to no progress from year to year, Student's minutes were decreased in both reading and math as of the February 17, 2022 IEP. For all of these reasons, it is the

opinion of this Hearing Officer that District failed to provide FAPE to Student on his March 12, 2020, January 29, 2021, and February 17, 2022 IEPs. As such, District substantively violated the IDEA.

**FAPE: Communication, Social, and Behavior Deficits.** Parents alleged in their due process complaint that District failed to appropriately address Student's deficits in communication, social skills, and behavior. Parents did not, however, meet their burden in establishing this allegation. Student's March 12, 2020, January 29, 2021, and February 17, 2022 IEPs all provided for special education minutes and speech language therapy minutes pertaining to social skills. Although Student's annual goal pertaining to these areas lacked objectives, the testimony of Student's teachers indicated that Student's communication and social skills were significantly improving year by year.

As for behavior, Student had a BIP in place during the March 12, 2020 IEP, and Student's fourth and fifth grade teachers testified that Student's behavior had improved to the point that the BIP was not needed on a continual basis. In addition, although Student had three elopements during the 2020-2021 and 2021-2022 school years, District quickly responded to those events and created additional safety and behavior plans to address Student's behavior. As such, it is the opinion of this Hearing Officer that Student's IEPs in the third (2019-2020), fourth (2020-2021), and fifth grades (2021-2022) did not fail to provide FAPE to Student in the areas of communication, social skills, and behavior, and, therefore, did not constitute a substantive violation of the IDEA.

## ORDER:

The results of the testimony and evidence warrant a finding for Parents. Specifically, Parents have introduced sufficient evidence in the record to establish by a preponderance of

the evidence that District denied Student a FAPE between February 25, 2020 and February 25, 2022. As such, District is hereby ordered to do the following:

1. By or before October 15, 2022, District shall have Student comprehensively evaluated for the purpose of obtaining current information so as to determine Student's academic deficits.

2. The comprehensive evaluation of Student must contain, at a minimum, testing to determine Student's intelligence, reading abilities (all facets including, but not limited to, basic reading skills, reading comprehension, reading fluency, and word and letter identification), phonological awareness and processing, writing skills (including spelling, punctuation, grammar), math skills, adaptive behavior, performance on classroom-based assessments and scales, speech deficits and occupational therapy needs. In addition, the comprehensive evaluation must include assessments aimed at determining the extent to which ADHD may, if at all, contribute to Student's academic issues.

3. District is required to hold an IEP meeting for Student for the purpose of discussing the results of the comprehensive evaluation ordered in paragraphs 1 and 2 by or before November 1, 2022. At this IEP meeting, District and Parent shall discuss all evaluation results and determine what special education programming is necessary. If the comprehensive evaluation of Student shows dyslexia to still be an issue for Student, Student's programming must include a dyslexia intervention program to address this issue.

**FINALITY OF ORDER AND RIGHT TO APPEAL:**

The decision of this Hearing Officer is final. A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Section 10.01.36.5, *Special Education and Related Services: Procedural Requirements and Program Standards,* Arkansas Department of Education 2008, the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

/s/ Danna J. Young
_____
**HEARING OFFICER**

09/09/2022
_____
**DATE**