IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**E.C. and T.C., individually and
as Parents of J.C.**                                                                    **PLAINTIFFS**

**V.**                                        **4:23CV00176 JM**

**LITTLE ROCK SCHOOL DISTRICT**                                        **DEFENDANT**

<u>**ORDER**</u>

Plaintiffs' motion for judgment on the record (ECF No. 11) is denied. The hearing officer's

decision is affirmed with respect to plaintiffs' Individuals with Disabilities Education Act ("IDEA")

claim.

I.        Procedural Background

E.C. and T.C. ("Parents") are the parents of J.C. and seek judicial review of a state

administrative proceeding under the Individuals with Disabilities Education Act (the "IDEA"). On

February 25, 2022, Parents filed a due process complaint (H-22-34) with the Arkansas Department of

Education ("ADE") alleging the Little Rock School District (the "District") denied J.C. a free and

appropriate public education ("FAPE") under the IDEA. By order dated September 9, 2022, the

hearing officer ("HO-1") ruled that the District denied J.C. a FAPE from February 25, 2020 to

February 25, 2022.

On September 6, 2022, three days before the HO-1 published her final decision in H-22-34,

Parents filed a second due process complaint (H-23-10) with the ADE. The second complaint alleged

that the District failed to provide J.C. a FAPE from February 25, 2022 through September 6, 2022

and requested tuition reimbursement for J.C.'s placement at Christ Little Rock private school. An

administrative hearing in H-23-10 was held on March 8, 9, 10, and 17 and May 1, and 2, 2023. At

that time, J.C. was an eleven-year-old male that resided in the Little Rock School District. He had

attended school in the District from kindergarten through the fifth grade. (Am. Comp. ECF No. 5).

J.C. was currently attending a private school located in the District where he repeated the fifth grade. The HO for this complaint ("HO-2") ruled that the District provided J.C. with a FAPE for the time period of February 25, 2022 through September 6, 2022 and denied their request for reimbursement. The Parents seek review of HO-2's decision in H-23-10. They seek reimbursement for J.C.'s private school tuition and costs for the 2022-23 school year, the 2023-24 school year, and tuition until such time as the District offers a placement with an appropriate IEP. The Parents further seek attorneys' fees as the prevailing party in H-22-34 and H-23-10.

II.        Facts

After reading the administrative record in its entirety, the Court finds that HO-2's findings of fact are an accurate statement of the facts presented in the record.[1] Those facts, in relevant part, are stated below. *See Ind. Sch. Dist. No. 283 v. S.D. by J.D.*, 88 F3d 556, 561 (8th Cir. 1996).

1.        J.C. was diagnosed as having Autism Spectrum Disorder ("ASD") and Attention Deficit Hyperactivity Disorder ("ADHD") in 2016, just prior to and during his kindergarten year. AR 2979-2980. At the time, he was functioning within the low average range of intelligence and was functioning academically at a level consistent with his IQ scores. AR 3614.

2.   J.C. received special education services pursuant to the IDEA the entire time that he was enrolled in the District.

3.   J.C.'s fourth grade IEP that ran from 1/9/21 to 1/24/22 reflected that J.C. "struggles to understand concepts of division and fourth grade math concepts" but that J.C. was "reading on a DRA level 40 (mid-4th grade)." AR3980.

4.   J.C.'s fifth grade General Education Teacher reported to Parents that J.C. was reading on approximately a 3.5-4.5 grade level on February 8, 2022; although J.C.'s NWEA Map scores were lower, the teacher noted they were "not indicative of what [J.C.] can do." AR 1442.

---

[1] The Parents have filed a Statement of Material Facts in support of their motion for judgment on the record. (ECF No. 12). However, there are few facts included in the Statement. Rather, the Statement repeats legal arguments as factual findings.

5.  In the hearing of H-23-10, the Principal clarified that at the February 17, 2022 IEP meeting, the IEP team added some modifications under the Consideration of Special Factors to assist with J.C.'s safety in light of the February 16, 2022 elopement. AR 324, 1093-1094, 1279.

6.  J.C.'s February 17, 2022 IEP included a statement of present levels of academic achievement, noting that J.C. typically arrived at school on time and was prepared and ready to engage in the classroom. AR 3448-3457. J.C.'s teacher also noted that J.C. enjoyed being engaged in large and small group settings and was not hesitant to ask questions but noted that he often attempted to control his environment by "asking repeatedly to leave the classroom to visit the principal" or take breaks. *Id.*

7.  Regarding social skills, J.C.'s February 17, 2022 IEP noted that he struggled with his peers and being able to appropriately process worries of not fitting in. AR 3448-3457. Specifically, the present levels section of the IEP states as follows: "He will lash out when he has these feelings by making inappropriate comments or accusations. Often it consumes his day, and he needs support of administration or the school counselor until he is able to reason. [J.C.] needs strict structure and understanding of any routine changes that may occur." *Id.* Regarding reading, J.C.'s IEP noted that J.C. had a strong vocabulary as compared to his peers and was able to make inferences from a text. *Id.* It was also noted that J.C. excelled in both comprehension from reading, as well as auditory comprehension. *Id.* Regarding writing, it was noted that J.C. needed prompts to stay on task and benefitted from writing rubrics and graphic organizers. *Id.* Finally, regarding the academic area of math, J.C.'s IEP team noted that J.C. struggled with attention in breaking down word problems into manageable chunks and identifying place values with decimals; however, he was "successful with grade level standards and minimal support in the area of math." *Id.*

8.  J.C.'s February 17, 20200 IEP also included a statement of modifications and accommodations, specially (1) preferential seating; (2) clearly defined limits, rules, and consequences posted and

implemented; (3) redirection of inappropriate behavior; (4) redirection during testing and sear

work: (5) positive praise check-ins; (6) reduced writing assignments; (7) small group or 1:1

intervention; (8) peer tutoring; (9) adult accompaniment for transitions outside of the classroom;

(10) notification to admin/office if J.C. ran away from adult; (11) check in and check out by an

adult during recess; (12) plans for substitute teachers regarding transitions; (13) J.C. located away

from the classroom doors; (14) J.C. seated close to teacher; (15) positive reinforcement for work

completion; and (16) instruction of replacement behavior. AR 3448-3457.

9.   J.C.'s February 17, 2022 IEP, as in prior school years, included three goals, one each in the areas

of reading/writing, math, and speech-language therapy. AR 3448-3457. J.C.'s reading/writing

goal provided that when J.C. was presented with an opinion-based writing prompt, J.C. would

produce a written work that included three paragraphs, an introduction/claim, three pieces of

evidence to support the claim, an opposing view statement, and conclusion (with correct

punctuation and capitalization) with 80% accuracy by the end of the IEP cycle. *Id.* It was noted

that progress pertaining to this goal would be based on work samples and grades. *Id.* J.C.'s math

goal provided that J.C. would "represent, compute, and solve math problems involving

multiplication and division of fractions while utilizing grade-appropriate mathematical language

and reasoning skills as demonstrated by 80% accuracy." *Id.* It was noted that progress pertaining

to this goal would be based on observation charts and work samples. *Id.* J.C.'s speech-language

therapy goal provided that J.C., when presented with age appropriate books, scripts, role-playing

activities, and real-life situations, would "demonstrate improved social communication skills by

(a) inferring feelings and ideas of others, (b) exhibiting reciprocity in interactions . . . (c) playing

appropriately with peers in structured and unstructured settings . . , and (d) role-playing cause

and effect problem-solving with at least 80% accuracy across three consecutive sessions by

2/7/2023." *Id.* It was noted that progress pertaining to this goal would be based on scoring rubrics

and "data response." *Id.* None of the goals included specific objectives. *Id.*

10. J.C.'s February 17, 2022 IEP provided for J.C. to receive 240 minutes per quarter (four hours0 of speech/language services in social skills, 30 minutes per week of direct instruction in reading, and 30 minutes per week of direct instruction in math. AR 3454. J.C. was not scheduled to receive occupational therapy. AR 3448-3457. The IEP did not specifically address a Dyslexia intervention program to be provided to J.C. via special education or in the general education curriculum. *Id.* J.C.'s February 17, 2022 IEP was signed by Parents (father), a general education teacher, a special education teacher, a speech language pathologist, the assistant principal, the Learning Education Agency Representatives, and the school counselor. AR 3457.

11. In the February 25, IEP meeting, the IEP Team developed some of the content of the J.C. Elopement Plan.AR 1093-1094. However, the document titled J.C. Elopement Plan was drafted by the District Principal after the IEP meeting was dismissed and emailed to Parents. AR 1093-1095.

12. J.C.'s speech evaluation in fifth grade reflected that J.C. was in the normal range. AR 1369-1379. The District's Speech Pathologist was treating the J.C. for pragmatics (social skills) not expressive or receptive language issues.AR 2572. Minutes were decreased to 30 minutes per week at the February 2022 IEP meeting to reduce the time the J.C. missed general education, and the District's Speech Pathologist provided those services until the end of the school year in May of 2022. AR 2610. The District's Speech Pathologist's therapy notes reflected J.C.'s progress in social skills. AR 1732-1745.

13. J.C.'s Special Education Teacher stated J.C. was on grade level in math despite the NWEA Map scores, but the J.C.'s tests show differently due to J.C.'s behaviors during the assessment. AR 327-328. She also stated J.C. is "a beautiful reader, he is very fluent, he is very expressive . . . we would read fifth grade material." AR 293. She further stated J.C. would have major task avoidance during the NWEA and ACT Aspire. AR 292.

14. After discussing the NWEA Map cores, J.C.'s father stated he is "smarter than his test scores" but does not believe he is on a sixth-grade level. AR 1146.

15. Parents began looking at private schools for J.C. in January of 2022. AR 1715.

16. The District Principal called the IEP meeting on February 25, 2022 to talk about how the school could ensure the J.C. could come back to school safely. AR 975. At the February 25, 2022 IEP meeting held to address J.C.'s February 22, 2022 elopement, the Parent Advocate advised the District that if the District could not assure J.C.'s safety, Parents would place J.C. in a private school. AR 1315; Parent Ex. Vol V Video of February 25, 2022 IEP meeting.

17. During the February 25, 2022 IEP meeting, the District requested Parents' written consent to perform a functional behavior assessment ("FBA") for J.C. after J.C.'s elopements on February 16 and 22, 2022. AR 261, 270, 345-351. The District did not obtain written consent to conduct a 2022 FBA for the J.C. AR 343.

18. On February 25, 2022, after the IEP meeting that day, District staff developed a document entitled "School Elopement Plan" to prevent J.C. from eloping again, and Principal put at the bottom of the document "file with building administrator/office/IEP." AR 1094, 1318-1319.  The School Elopement Plan was not incorporated into J.C.'s IEP, but the Safety Plan developed by the IEP team on February 17, 2022 was incorporated into the IEP. AR 1279, 1093-1094. The District Principal did not consider sending the J.C. to an alternative placement. AR 1083, 1098. The School Elopement Plan and Safety Plan were implemented. AR 1095-1096.

19. The District's Principal and two Assistant Principals talked with the J.C. after he returned to school after the elopements, told him they were glad he was back at school, told him they expected him to remain on school grounds during school hours, and told him to reach out to them if he needed support. AR 987-990. They explained he would be escorted to a bench for dismissal. *Id.*

20. District's Licensed Psychological Examiner completed a psychoeducational evaluation of J.C. on March 10-11, 16-17, 2022. See AR 3930, 1555. The Examiner reported that J.C. was compliant and cooperative during testing. J.C. was administered the Wechsler Intelligence Scale for Children to measure J.C.'s overall IQ, and J.C.'s overall score was 89, which is considered to be average intelligence and was commensurate with J.C.'s prior IQ testing. AR 3931.

21. District's Licensed Psychological Examiner administered the WIAT to J.C. to determine his academic achievement levels in the following areas of word reading (score: 95), reading comprehension (score: 95), pseudoword decoding (score: 113), oral reading fluency (score: 112), phonemic proficiency (score: 92), and orthographic fluency (score: 103). *Id.* J.C. performed within the average range on each of those reading subtests, and his overall reading composite was 93, which is in the average range. *Id.* at 59-61. J.C.'s Dyslexia index composite made up of the subtests listed above was 103, which is also in the average range. *Id.* Based on J.C.'s performance on the Dyslexia index composite on the WIAT, J.C. was not experiencing any deficit in that area. See H-23-10 Tr. Vol. II pp. 66-67. J.C.'s math composite was 88 with subtest scores of: math problem solving (score: 83) and numerical operations (score L 96). AR 3934.

22. According to District's Licensed Psychological Examiner, J.C.' achievement testing demonstrates that he has the skill set to function at his grade level. score reported that J.C. was compliant and cooperative during testing.

23. District's Licensed Psychological Examiner reviewed J.C.'s performance on the NWEA Map testing which was below grade level. AR 463-464. Because J.C.'s NWEA performance did not align with his grades and his achievement testing with her, she questioned his Special Education Teacher about his performance on the NWEA Map who reported that J.C.'s defiant behavior during the NWEA testing and that the scores do not reflect his ability. AR 453, 463.

24. District's Licensed Psychological Examiner observed J.C. in class and saw him behaving like a "typical child;" she spoke with teacher who reported that he "hadn't had any behaviors out of [J.C.]." AR 3990, 434.

25. J.C.'s Special Education Teacher and Fifth Grade General Education Teacher report that J.C.'s NWEA scores are not representative of his capabilities but reflect J.C.'s task avoidance. See H-22-34 Vol. II pp. 179-80; Vol. III pp. 135, 162-163; H-23-10 Parent Ex. Pp. 45, 161-63. When the Special education Teacher would test the J.C. in a small group, he would refuse to do the test. H-23-10 Tr. Vol. I pp. 52-53.

26. Between February and March of 2022, the District's Speech Pathologist administered J.C. examinations needed for his Speech-Language Re-evaluation which was completed on March 18, 2022 and a report was completed on March 21, 2022. See H-23-10 Dist. Ex. Pp/ 381-91; Parent Ex. Pp. 91-101. J.C.'s voice qualities and speech fluency were "adequate," and his articulation skills were in the "average range for his chronological age and gender." *Id.* His receptive and expressive language skills were within the average range, as well as his pragmatic skills; however, "implementation of these skills in 'real life' situations is sometimes challenging for [J.C.]." *Id.* The District's Speech Pathologist recommended continuing speech language therapy for the implementation of social skills as an option for the team to consider. *Id.*

27. On March 18, 2022, the J.C.'s IEP Progress Report showed progress on his goals. J.C.'s reading goal progress, which was essentially a writing goal, stated: "[J.C.] is able to verbally process his introduction and evidence. He excels at writing a hook for a claim. With checklists and in a one-on-one small group. [J.C.] needs several prompts to stay on task when given the task of writing. Working at 75% toward independence in writing samples." See H-23-10 Dist. Ex. P. 347. J.C.'s progress on his math goal on March 18, 2022 stated: "[J.C.] is working toward identifying LCM (least common multiple) 80%." *Id.* His behavior/social skills goal progress stated: J.C. was able to "demonstrate improved social communication skills by (a) inferring feelings and ideas of

others (90%), (b) exhibiting reciprocity in interactions (95%), playing appropriately with peers in structured and unstructured (90%), and (d) role-playing cause and effect problem-solving with at least 90% accuracy across three consecutive sessions by 2/7/23 (85%)." *Id.*

28. On March 21, 2022, the District gave Parents notice of an evaluations conference to be held on April 7, 2022. AR 1320. The District requested Parents' consent to a 2022 FBA in writing. See id at p. 39. Although Parents verbally consented (see H-23-10 Parent Ex. P. 37), written consent did not occur, and the District did not conduct a 2022 FBA. AR 1313, 245.

29. The evaluation conference was held on April 7, 2022 to review the recent evaluation results and speech-language testing, and Parents and Parent Advocate attended virtually.ar 13211322. The Notice of Action reflects that the IEP team determined that the J.C. would remain eligible for special education services under OKI and noted that the J.C. was in "stay put" due to the due process hearing filing in H-23-10. AR 1864-1865. The IEP team made no changes to the IEP at that time. *Id.* The Parents were to receive adaptive rating scales to complete, and an addendum to the psycho-education report would be added. *Id.* In response to the Parents' questions regarding teacher rating of the J.C. on Aggression and Conduct noting no Behavior Incidents, District staff explained that teachers address behaviors in class in the moment so no referrals to administrators had been warranted. *Id.* The examiner recommended Parents share the evaluation with J.C.'s counselor. *Id.* J.C. would continue to receive resource and speech therapy. *Id.* The discrepancies in the NWEA scores and J.C.'s performance on the psycho-education achievement tests were discussed. *Id.* The Special Education Teacher wo administered the NWEA explained that he NWEA results are not likely an accurate depiction of J.C.'s abilities because J.C. rushed though and did not put much effort into doing his best. *Id.* The District's License Psychological Examiner discussed J.C.'s elopements and provided resources to Parents, as well as noting that she observed the District has provided a "para" to assist with the J.C.'s safety in terms of elopement from school. *Id.*

30. As no changes were made to the goals or services in J.C.'s February 17, 2022 IEP, as reviewed on April 7, 2022, that IEP remained in place for the remainder of the spring semester in 2022 and was the IEP in effect when school began in the fall of 2022. AR 1276-1285. Elements of the J.C.'s Safety Plan were contained on the Special Factors page. *Id.*

31. The District was aware the Parents were looking at private school placement for the J.C., and the District did not create a plan to transition the J.C. to the District's Middle School. AR 277, 305. However, the J.C.'s Fifth Grade General Education Teacher did have the J.C. complete a middle school placement course recommendation form in March of 2022.  He did not believe the J.C. should be retained. AR 838-834. The District's Middle School houses grades sixth, seventh, and eighth, and there are fewer students at the District's Middle School than at the District's Elementary School where the J.C. attended. AR 519-520. The District did not suggest any alternative to the District Middle School at Pinnacle, until the resolution conference. AR 1194-1195.

32. Parents did not request a transfer of J.C. to another school in the District or in Pulaski County School District to address their concerns regarding bullying at J.C.'s existing District school placement, even though a transfer to another school placement would have addressed Parents' bullying concerns. AR 1233-34.

33. On May 27, 2022, J.C.'s IEP Progress Report showed continued progress on his reading/writing and math goals. AR1855-56. J.C.'s reading goal, which was essentially a writing goal progress note stated: "[J.C.] has made progress at 80% with independently working through checklists and rubrics when writing an opinion piece," which was an improvement from 75% in March of 2022. AR 1855. On his math goal on May 27, 2022, the progress note stated: [J.C.] is able strategies [sic] with multiplication of fractions at 80%." *Id.* J.C. met his behavior/social skill goal because he was able to "demonstrate improved social communication skills by (a) inferring feelings and ideas of other (93%), (b) exhibiting reciprocity in interactions (94%), (c) playing appropriately

with peers in structured and unstructured (90%) and (d) role-playing cause and effect problem-solving with at least 90% accuracy across three consecutive sessions by 2/7/23 (91%)." AR 1855-56

34. J.C.'s District fifth grade report card reflects the following grades for the third and fourth quarters of 2022: Language Arts (3rd-C, 4th-B),Science (3rd-B, 4th-C), Math (3rd- B, 4th-B), Art (3rd-A, 4th-A), Music (3rd-A, 4th-A), Social Studies (3rd-B, 4th-C), Physical Education (3rd-A, 4th-A). AR 1444.

35. On July 28, 2022, J.C. received an Occupational Therapy Initial Evaluation by Examiner Tracy Morrison. Dr. Morrison evaluated J.C. and stated that J.C. needs occupational therapy or physical therapy or speech therapy for two to three hours per week to prevent J.C. from becoming frustrated and withdrawing. AR 0679-0705. The Occupational Therapist observed that J.C. is age-appropriate in a lot of his cognitive skills, but he is socially behind. *Id.* She observed him for a full day in his school setting and stated he is capable of learning at level, but struggles with anxiety, particularly when information is not delivered one-on-one. AR 06700. She stated: [P]ersons like the J.C. are intelligent, but they may not test that way because they have anxiety." AR 0739.

36. J.C.'s father asserted private school testing showed J.C.'s academic skills were consistent with the District's NWEA map testing, which showed first to second grade levels, but Parents had no documentation to support this. AR 1144, 1158, 1173. J.C.'s mother stated that a private school told her, after some testing, the J.C. would need to repeat fifth grade. AR 1219-20.

37. In the fall of 2022, J.C. was admitted to Christ Little Rock ("Private School"), which was chosen after J.C.'s admission was declined at other schools. AR 1181-1182. Because previous private schools had determined J.C. could not be placed there due to prior elopements or the behavior rating scales, Parents did not inform the Private School of the past elopements and did not provide the Private School with J.C.'s most recent 2022 IEP. AR 1178-1184, 1207.

38. Since placement at the Private School, NWEA Map testing showed an increase in J.C.'s math score since the beginning of the 2022-23 school year from 15th to 36th percentile, but J.C.'s reading score was in the 26th percentile first quarter and then 14th percentile second quarter, which the Private School Director attributed to rapid guessing or rushing to finish by J.C.  AR 1255. The Private School Director did not think the NWEA Map scores were a true indication of J.C.'s abilities. AR 1256. Conversely, J.C.'s STAR Reading score went from the 16th percentile in August of 2022 to the 26th percentile in January of 2023. *Id.* J.C. is working on executive management skills. AR 1187. J.C. receives help in reading and math by being pulled out by the Private School's special education teacher into a small group for additional instruction. AR 1189, 1252-1255.

39. At the District, J.C. would get in the car crying after school, and he would not want to talk about his day. AR 1185. At the Private School, J.C. gets in the car telling his Parents about what he did, and kids at the Private school have been welcoming to the J.C. AR 1229-1230. The Private School is small with 118 students, 16 children are in J.C.'s class, and the same teachers are with the students wherever they go. AR 1208-1209.

40. J.C. has enrolled in the Private School's Social Club, which is a pragmatics class after school where students practice interactions with each other in "real life." AR 1254, 1190-1191. J.C.'s mother sees improvement in J.C.'s social skills since attending the Private School, such as not interrupting conversations and being more insightful. AR 1229-1232.

41. J.C. is currently repeating fifth grade at the Private School. AR 1147-1148. The Private School Director stated that J.C.'s placement in the fifth grade classroom is appropriate. AR1248.

42. J.C.'s fifth grade report card at Private School lists his semester grades in the fall of 2022 as: Language Arts-B, Religion-A, RO Math-A, Science/Health-C, Social Studies-B. AR 1445. J.C.'s father conceded the Private School grades are similar to J.C.'s grades in fifth grade at the District, but J.C.'s father asserted J.C. is no longer graded on a curve. AR 1201-1202.

43. From February 25, 2022 to September 6, 2022, J.C. finished fifth grade at the District's Don Roberts Elementary. AR 2. J.C. did not elope again after February 22, 2022.

44. On September 6, 2022, Parents filed Complaint H-23-10 alleging the District failed to provide J.C. with a FAPE within a reasonable period of time and seeking private school tuition reimbursement pursuant to 20 U.S.C. § 1412(a)(10)(C)(ii).

45. On September 9, 2022, HO-1 entered a Final Decision and Order in H-22-34 finding in favor of the Parents that the District denied J.C. a FAPE since February 25, 2020, and that the IEPs developed by the District in 2020, 2021, and 2022 were not reasonably calculated to enable J.C. to make appropriate progress in reading and math. AR 1451-1490.

III.            Legal Standard

Under the IDEA, parents may file a due process complaint to challenge "the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child." 20 U.S.C. § 1415(b)(6)(A). Complaints are resolved by a due process hearing conducted by the state or local educational agency or, if desired by the interested parties, voluntary mediation. 20 U.S.C. § 1415(e)–(f). The purpose of the due process hearing is to determine whether the child received a FAPE. 20 U.S.C. § 1415(f)(3). The burden of proof falls on the party seeking relief. *Sneitzer v. Iowa Dep't of Educ.*, 796 F.3d 942, 948 (8th Cir. 2015).

A party may seek review of the administrative proceedings by bringing a civil action in state or federal court. 20 U.S.C. § 1415(i)(2). A federal district court reviewing an agency decision under the IDEA must conduct a de novo review to determine whether the aggrieved party is entitled to relief based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii); *I.Z.M. v. Rosemount-Apple Valley-Eagan Pub. Schs.*, 863 F.3d 966, 970 (8th Cir. 2017). Courts, however, must give "'due weight' to the outcome of the administrative proceedings." *I.Z.M.*, 863 F.3d at 970 (quoting *T.F. v. Special Sch. Dist. of St. Louis Cty.*, 449 F.3d 816, 818 (8th Cir. 2006)). The Eighth Circuit acknowledged that "review in IDEA cases 'is, in reality, quite narrow.'" *Osseo Area Sch., Indep.*

*Sch. Dist. No. 279 v. A.J.T. by & through A.T.*, 96 F.4th 1062, 1065 (8th Cir. 2024) (quoting *Petersen v. Hastings Pub. Schs.*, 31 F.3d 705, 707 (8th Cir. 1994)). "Courts are limited to reviewing whether the school district followed the IDEA's procedures and whether the student's IEP provided a FAPE." *Id.* (citation omitted). The Eighth Circuit further "recognized that this limited grant of deference— 'due weight'—is appropriate in IDEA cases because the ALJ 'had an opportunity to observe the demeanor of the witnesses and because a [district] court should not substitute its own notions of sound educational policy for those of the school authorities that [it] review[s].'" *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011) (quoting *CJN v. Minneapolis Pub. Schs.*, 323 F.3d 630, 636 (8th Cir. 2003), cert. denied, 540 U.S. 984, 124 S. Ct. 478 (2003)).

Courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). "This is because, as the *Rowley* Court admonished, "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.'" *Greene Cnty. Tech Sch. Dist. v. MW*, 2020 WL 2840156, at *5 (E.D. Ark. May 31, 2020) (quoting Rowley, 458 U.S. at 208); *see also Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 654–55 (8th Cir. 1999) (examining the review process).

"The IDEA's principal purpose is to ensure all students with disabilities 'have available to them a free appropriate public education.'" *Kass v. W. Dubuque Cmty. Sch. Dist.*, 101 F.4th 562, 568 (8th Cir. 2024) (quoting *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 166, (2017) (quoting 20 U.S.C. § 1400(d)(1)(A)). "A FAPE 'consists of educational instruction specially designed to meet the unique needs' of the student and any services that are necessary to permit the student to benefit from the instruction." *Kass*, 101 F.4th at 568 (*quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 188–89 (1982)). "The IDEA's legal requirements are fulfilled if (1) a school district complies with the law's procedures in developing an IEP, and (2) the resulting IEP is reasonably calculated to enable the student to make progress appropriate in light of the student's

circumstances." *Id.* at 568-69. The statute also requires that students with disabilities be educated in

the "least restrictive environment," 20 U.S.C. § 1412(a)(5)(A), reflecting a "strong preference" that

disabled children attend regular classes with non-disabled children and a presumption in favor of

placement in the public schools. *Independent Sch. Dist. No. 283 v. S.D.*, 88 F.3d 556, 561 (8th Cir.

1996). "[C]hildren who can be mainstreamed should be mainstreamed, if not for the entire day, then

for part of the day; similarly, children should be provided with an education close to their home, and

residential placements should be resorted to only if these attempts fail or are plainly untenable." *T.F.*

*v. Special Sch. Dist. of St. Louis County*, 449 F.3d 816, 820 (8th Cir. 2006) (citing *Evans v. Dist. No.*

*17*, 841 F.2d 824, 832 (8th Cir. 1988)).

"[A] school district must convene a team to formulate an IEP in light of the child's abilities and

parental views about the child's education." *Gill v. Columbia 93 Sch. Dist.*, 217 F.3d 1027, 1034 (8th

Cir.2000) (citing 34 C.F.R. §§ 300.343(b)(2), 300.346(a)(1)). An IEP means "a written statement for

each child with a disability that is developed, reviewed, and revised in accordance with section

1414(d)." 20 U.S.C. § 1401(a)(11). "The parents, the child's teacher, and a school official

knowledgeable about special education must be included on the team which devises and reviews the

IEP, and parents are free to invite other individuals with expertise to participate." *Gill*, 217 F.3d at

1034. "The IEP must include a statement of the student's academic and functional performance,

describe how her disability affects her learning, set out measurable goals, and track her progress."

*Osseo Area Sch., Indep. Sch. Dist. No. 279*, 96 F.4th at 1065 (citing § 1414(d)(1)(A)(i)(I)–(III);

*Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE–1*, 580 U.S. 386, 391, 137 S.Ct. 988, 197

L.Ed.2d 335 (2017)). "And to be substantively adequate, it must be 'tailored to the unique needs' of

the individual student and 'appropriately ambitious,' meaning it must be 'reasonably calculated to

enable a child to make progress appropriate in light of [her] circumstances' and give her a 'chance to

meet challenging objectives.'" *Id.* (quoting *Endrew F.*, 580 U.S. at 401–04).

IV.        Analysis

The Parents claim that they are entitled to reimbursement for J.C.'s private school tuition pursuant to 20 U.S.C. § 1412(a)(10)(C)(ii) because the February 17, 2022 IEP failed to address J.C.'s lack of progress in reading and math which denied him a FAPE and because Christ Little Rock was an appropriate placement for J.C. Further, they argue that the February 17, 2022 IEP failed to provide J.C. with a FAPE as a matter of law based on HO-1's ruling in H-22-34. The Parents also seek attorneys' fees and costs as the prevailing party in proceedings under the IDEA. 20 U.S.C. § 1415(i)(3)(B)(i).

A.  Issue Preclusion

The Parents contend that federal and state law required HO-2 in H-23-10 to give preclusive effect to HO-1's decision in H-22-34 finding that the February 17, 2022 did not provide J.C. with a FAPE.

"Issue preclusion, or collateral estoppel, provides that 'once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.'" *Plough By & Through Plough v. W. Des Moines Cmty. Sch. Dist.*, 70 F.3d 512, 515 (8th Cir. 1995). "Collateral estoppel is designed to prevent repetitious lawsuits over matters which have once been decided and which have remained substantially static, factually and legally." *Olsen v. Mukasey*, 541 F.3d 827, 831 (8th Cir. 2008) (internal quotation marks omitted). To bar relitigation, the Court must find:

(1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment.

*Id.* at 830–31 (citations omitted).

The Parent's claim of issue preclusion fails because the issues in H-22-34 and H-23-10 involved different periods of time: February 25, 2020 through February 25, 2022 versus February 25, 2022 through September 6, 2022. The HO-1 in H-22-34 did not determine whether J.C. received a FAPE from February 25, 2022 to September 6, 2022. The facts were not static during those two time periods. After February 25, 2022, an elopement plan was enforced by the staff at Roberts and J.C. responded favorably to the plan which enabled him to be present in the classroom. HO-1 in H-22-34 did not determine whether the Parents were entitled to tuition reimbursement for private school placement at Christ Little Rock. She did not determine whether J.C. was provided appropriate supports and services to address his academic deficits in reading and math during the time period. Therefore, the Parents cannot satisfy the second, third, and fourth requirements of issue preclusion.

## B. Law of the Case

The Parents contend that HO-1's finding that J.C. did not receive a FAPE from February 25, 2020 through February 25, 2022 was the law of the case in H-23-10. The law-of-the-case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 816 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). "This doctrine 'requires courts to adhere to decisions made in earlier proceedings in order to ensure uniformity of decisions, protect the expectations of the parties, and promote judicial economy.'" *Murphy v. FedEx Nat'l LTL, Inc*., 618 F.3d 893, 905 (8th Cir. 2010) (quoting *United States v. Bartsh*, 69 F.3d 864, 866 (8th Cir. 1995)). Courts apply the law-of-the-case doctrine differently depending on the context of each case. *See Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co*., 299 F. Supp. 2d 903, 911 (N.D. Iowa 2004). "Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. They do not

apply between separate actions, even if they are related. § 4478 Law of the Case, 18B Fed. Prac. & Proc. Juris. § 4478 (3d ed.)

As the Defendant points out, H-22-34 and H-23-10 are two separate cases. The decision to bring separate cases was made by the Parents. Having reviewed the administrative record of both cases, the Court finds that HO-1's decision regarding the adequacy of J.C.'s FAPE from February 25, 2020 until February 25, 2022 is the law of H-22-34, but it is not the law of H-23-10. The cases involve different issues in different time periods in separate cases.

C.  Final Decision by HO-2

The Parents argue that HO-2's decision in H-23-10 should not be given any deference by this Court because she considered improper evidence in making her decision. The Parents contend that HO-2 should not have considered any evidence that was not available to the IEP team on February 17, 2022. They argue that an IEP is appropriate based on the information available to the IEP team when it was developed, at the time it is offered to the student. Specifically, the Parents argue that HO-2 should not have considered the testimony of Christ Little Rock's Director, J.C.'s grades from Christ Little Rock, the March 2022 psychological evaluation, statements made at an April 7, 2022 IEP meeting, and the July 2022 occupational therapy evaluation.

The Parents cite *Indep. Sch. Dist. No. 283 v. E.M.D.H*, 960 F.3d 1073 (8th Cir. 2020) for the proposition that "only evidence known to the IEP team on February 17, 2022, should be considered in determining whether J.C.'s February 17, 2022, [IEP] provided J.C. a FAPE." (ECF No. 13 at p. 10). The District argues that the Parents misinterpret *E.M.D.H.* as well as other cases they rely upon to support their theory. The Court agrees. The Eighth Circuit in *E.M.D.H*. found that it was not an abuse of discretion for the district court to refuse the District's request to supplement the administrative record because "[t]he proposed supplementation elucidating how the student was performing *after the ALJ had entered his order* and the District had implemented the student's IEP is

immaterial to the merits of the student's due process complaint." *E.M.D.H.*, 960 F.3d at 1079 (emphasis added).

Similarly, in *West Platte R-II Sch. Dist. v. Wilson*, the District attempted to supplement the record before the district court. The Eighth Circuit explained, "The IDEA permits a reviewing court to admit additional evidence to supplement the record if a party has a solid justification for doing so. Rendering a decision on the record compiled before the administrative agency, however, is the norm. The additional evidence that the District attempted to provide related to the progress and status of L.W. *subsequent to the administrative hearing*." *W. Platte R-II Sch. Dist. v. Wilson*, 439 F.3d 782, 785 (8th Cir. 2006) (emphasis added) (citing *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 560 (8th Cir.1996)). The evidence presented at the administrative hearing was properly considered by HO-2. The Parents have not cited, and the Court has not found, any authority stating that an ALJ cannot consider evidence relating to a student's progress after an IEP is developed.

In the alternative, the Parents argue that HO-2 ignored evidence that the IEP team had on February 17, 2022 when it developed J.C.'s IEP, such as his standardized test scores reflecting a lack of academic progress. The Court finds that HO-2 did not ignore J.C.'s standardized scores. *See* AR 169-171. HO-2 specifically compared J.C.'s standardized test scores from his fifth-grade year in the District and his standardized test scores during his sixth-grade year at Private School with the testimony of witnesses. HO-2 explained her reasons for relying primarily on other measures to determine J.C.'s academic performance and progress.

> Since beginning at the Private School for the 2022-2023 school year, NWEA Map testing showed Student's academic skills in math improved from 15th to 36th percentile first quarter and then 14th percentile second quarter, which the Private School Director notably attributed to rapid guessing or rushing to finish by the Student. The Student's STAR Reading score increased from the 16th percentile in August of 2022 to the 26th percentile in January of 2023, which is particularly remarkable when compared with the Student's NWEA Map scores for those timeframes, which reflect the opposite movement in the Student's reading percentiles over that same time period. . . .
> Student's increase in Star Reading score and decrease in NWEA Map score for the same time period at Private School highlights the dubious reliability of NWEA Map and ACT tests results for this Student. Although the value of nationally normed standardized

testing as a measure of performance for most students is not lost on this Hearing Officer, for the reasons discussed herein, this Hearing Officer finds this Student's performance on the NWEA Map and Act test unreliable as a measure of this Student's academic abilities in light of evidence available in the timeframe of H-23-10.

In H-23-10, Special Education Teacher, the General Education Teacher, the Psychological Examiner, the independent Occupational Therapist, and even the father all stated Student's NWEA and ACT Aspire ("NWEA and ACT") scores were not accurate reflections of Student's academic achievement and abilities. Student's Special Education Teacher who was with the Student during NWEA testing explained that the NWEA testing results were not accurate for Student due to his defiant behavior during the NWEA testing. Student's Special Education Teacher further stated when she would test the Student in a small group, as in the NWEA and ACT, Student would refuse to do the test or, as she put it another way, "would have major task avoidance." Prior to any due process complaint being filed, Student's fifth grade General Education Teacher noted in writing on Student's reading performance report that Student's NWEA Map scores did not reflect Student's ability.

* * *

With witnesses for both parties in agreement, it is clear that the NWEA Map and ACT Aspire scores were not accurate measures of Student's academic abilities. Thus, other available measures must be reviewed to determine Student's level of academic performance and progress.

(AR 170-171).

There is ample evidence in the record to find that J.C.'s standardized test performance was not a reliable indicator of J.C.'s academic progress. "A standardized test is, by definition, designed to measure a child's progress without regard to her individual circumstances, let alone with regard to the individual circumstances for that child identified in her IEP." *G.D. by & through Jeffrey D. v. Swampscott Pub. Sch.*, 27 F.4th 1, 12 (1st Cir. 2022) (citing *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1082 (8th Cir. 2020); *William V. ex rel. W.V. v. Copperas Cove Indep. Sch. Dist.*, 826 Fed. App'x 374, 379 (5th Cir. 2020); *F.L. v. Bd. of Educ. of Great Neck Union Free Sch. Dist.*, 735 Fed. App'x 38, 40 (2d Cir. 2018); *cf. Doe v. Cape Elizabeth Sch. Dist.*, 832 F.3d 69, 81 (1st Cir. 2016) (noting that a child's "generalized academic performance," such as performance reflected on a standardized assessment, may "contradict[ ] the results of" assessments that are specifically tailored for a child).

The Court finds by a preponderance of the evidence that the District did not violate the IDEA or fail to provide J.C. a FAPE from February 25, 2022 to September 6, 2022. The decision of HO-2 is

affirmed. The Parents are not entitled to tuition reimbursement under the IDEA for their unilateral placement of J.C. in private school.

D. Attorneys' Fees

The parties have not briefed the issue of attorneys' fees. The Court will consider briefing on the issue of attorneys' fees in H-22-34. However, the Parents are not the prevailing parties in H-23-10, and attorneys' fees incurred in the litigation of this complaint will not be awarded.

I.      Conclusion

For the reasons stated above, the Court affirms the decision of HO-2 in H-23-10. The Court also finds that the District is entitled to Judgment on the Record as to Count II of the Amended Complaint.

IT IS SO ORDERED this 6th day of September, 2024.

James M. Moody Jr.
United States District Judge